E-FILED
Monday, 06 February, 2023 11:54:52 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

TRUSTEES OF THE N.E.C.A./LOCAL 145 I.B.E.W. PENSION PLAN, AS COLLECTION AGENT FOR ALL FRINGE BENEFITS,

Plaintiff,

v.

LINDA K. MAUSSER, individually and d/b/a QCA ELECTRIC,

Defendant.

Case No. 4:18-cv-04045-SLD-JEH

ORDER

This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. Plaintiff Trustees of the N.E.C.A./Local 145 I.B.E.W. Pension Plan, as Collection Agent for All Fringe Benefits sued Defendant Linda K. Mausser, individually and d/b/a/ QCA Electric, for unpaid contributions allegedly due to it pursuant to collective bargaining agreements ("CBAs") and an Agreement and Declarations of Trust ("Trust Agreement"). On December 9, 2022, the Court granted in part Plaintiff's motion for partial summary judgment, finding that Defendant was obligated under these agreements to pay contributions between January 2015 and the present and ordering Defendant to comply with an audit. Dec. 9, 2020 Order 9, ECF No. 37. A bench trial followed on November 23, 2022 to resolve whether and in what amount Defendant was delinquent in her contributions. *See* Nov. 23, 2022 Min. Entry. Each party has submitted proposed findings of fact and conclusions of law. Having considered the parties' arguments and the evidence submitted, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT[1]

### I. Parties

Plaintiff acts on behalf of the N.E.C.A./Local 145 I.B.E.W. Pension Plan (the "Plan") and also serves as the authorized representative of all benefit obligations arising under CBAs between the N.E.C.A./Local 145 I.B.E.W. Union (the "Union") and various employers. Defendant is an individual and the sole proprietor of QCA Electric.

### II. Relevant Agreements

In 2004, Defendant entered into a Letter of Assent with the Union, agreeing to be bound by the terms of the current CBA (titled "Inside Agreement") and any subsequent CBAs. Letter of Assent 1, Pl.'s Trial Ex. 1. The Inside Agreement requires those who have signed such a letter ("signatory employers") to make monthly contributions to a variety of funds based on the number of hours their employees spend engaging in covered activities and on the gross payroll and to "file a monthly electronic payroll report . . . for each contribution." *See* June 3, 2013–May 31, 2016 Inside Agreement ("Inside Agreement I") § 2.26(A), Pl.'s Trial Ex. 2.[2]

Pursuant to the Inside Agreement, signatory employers agree to "submit and participate in an auditing program conducted by [Plaintiff]." *Id.* § 2.26(C). As such, they "expressly agree to provide [Plaintiff] . . . with all payroll records, reports, and other reasonably requested information necessary to conduct a compliance audit." *Id.* The Inside Agreement also provides

[1] The findings of fact are made in compliance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact is deemed to be a conclusion of law, it is incorporated as such, and to the extent that any conclusion of law is deemed to be a finding of fact, it is incorporated as such.

[2] Plaintiff also submitted the Inside Agreement covering the period of May 30, 2016–May 31, 2019 ("Inside Agreement II") as an exhibit. *See* Inside Agreement II, Pl.'s Trial Ex. 3. Because the provisions referenced by the court are identical in both Inside Agreements, the Court cites above only to Inside Agreement I.

Inside Agreement II § 1.01 provides that after May 31, 2019, the agreement would "continue in effect from year to year thereafter, from June 1st through May 31st of each year, unless changed or terminated." There is no evidence before the Court to suggest that Inside Agreement II was terminated or replaced by another CBA.

that when contributions payments are delinquent—*i.e.*, not received within ten working days of their due date—"immediate steps will be taken to place the account in the hands of legal counsel for collection of all moneys due and owing." *Id.* § 2.26(B). In this event, the employer "shall be liable, in addition to all scheduled contributions, for all attorneys' fees and all reasonable costs incurred in the collection process including but not limited to filing fees, sheriff's costs, audit costs, interest and other expenses incurred." *Id.*

By agreeing to abide by the Inside Agreement, signatory employers and the Union also agree to be bound by the terms and provisions of the Trust Agreement. *Id.* § 2.19(B). The Trust Agreement endows Plaintiff with "the power to demand, collect, and receive [e]mployer [c]ontributions" and the ability to "take such steps, including the institution and prosecution of or intervention in any proceedings at law . . . , as may be necessary or desirable to effectuate the collection of such [e]mployer [c]ontributions." Trust Agreement § VI.1, Pl.'s Trial Ex. 4 at 1–19. An employer must "promptly furnish to [Plaintiff] in writing information concerning the classification of his [e]mployees, their names, social security numbers, the amount of wages paid and hours worked, and such other data as [Plaintiff] might require in connection with the administration of the Trust." *Id.* § VI.3. Plaintiff may also "take any and all reasonable steps necessary to audit the [e]mployers and collect [e]mployer delinquencies." *Id.* § VI.5.

The Trust Agreement was amended in October 2017. *See* Amendment to Trust Agreement, Pl.'s Trial Ex. 4 at 20–22; *see also* Trust Agreement § X.1 (providing that the Trust Agreement "may be amended to any extent at any time or from time to time by the unanimous vote of all the Trustees"). The amendment enumerates the types of records employers are required to provide to Plaintiff in the course of any audit conducted, such as payroll registers specifying employees' hourly rates of pay and hours worked, tax returns, copies of all

contribution reports and proof of payments, and listings of employees' job classifications. Amendment to Trust Agreement § IV.8. It also establishes that it is "the [e]mployer's obligation to maintain adequate, reliable, and contemporaneous records sufficient to determine the benefits due or which may become due to its employees" and that "[i]n the event that an [e]mployer fails to maintain adequate, reliable, and contemporaneous records establishing the amount of hours worked by employees who are paid on an hourly basis," it "hereby agrees that all hours worked [for] which the employee received pay or was entitled to receive pay from the employer . . . shall be considered hours worked for which contributions are due to the Fund." *Id.* § IV.11. It further provides that "[a]t the Fund's discretion, the Fund may calculate the hours worked by an hourly employee by dividing the total pay received by the employee during the applicable audit period by the journeyman wage rate set forth in the applicable [CBA]." *Id.*

## III. Audits

Cory Bergfeld, a trustee of the Plan and one of Plaintiff's witnesses, testified that signatory employers are subject to random audits, to be held within a five-year period. Bench Trial Tr. 12:1–3, 17:15–18, ECF No. 82. Employers may also be audited for cause, such as for suspicion of underreporting. *Id.* at 20:11–15. Defendant was subject to a random audit for calendar year 2015. *Id.* at 20:16–21. Bergfeld stated that Defendant did not comply with this audit because she had no records. *Id.* at 22:9–19. That non-compliance led to this lawsuit being filed. *Id.* at 23:15–17. And because of Defendant's failure to comply with the audit in 2015, Plaintiff sought to perform additional audits of Defendant in 2016, 2017, 2018, 2019, 2020 for cause. *Id.* at 23:21–24:2.

In its motion for partial summary judgment, Plaintiff requested that the Court order Defendant to submit to an audit. Mot. Partial Summ. J. 7–8, ECF No. 33. On December 9,

2020, the Court granted this request. Dec. 9, 2020 Order 9. Plaintiff asked Calibre CPA Group, PLLC ("Calibre Group"), the auditing firm it typically hires to perform payroll audits of signatory employers, Bench Trial Tr. 24:3–5, to conduct the audit, *id*. at 24:11–14. Tim Kalnes, an employee of Calibre Group, *id.* at 33:17–18, performed the audit, *see, e.g.*, *id.*, 35:14–22.

Kalnes, a fact witness for Plaintiff,[3] stated that the goals of such audits are to "ensure that the hours [employers are] reporting are accurate and match up, align with the ones that are reported to the funds." *See id* at 34:10–12. He testified that when performing an audit, he generally looks at payroll tax returns, Form 941s, payroll registers, and copies of the contributions made. *Id*. at 34:22–35:4. This case, however, was unusual: he had to work entirely from Defendant's tax returns and the Schedule C forms pertaining specifically to QCA Electric's finances. *Id*. at 36:10–20; *see* Schedule C Forms, Def.'s Trial Ex. 2.[4] To estimate the hours worked each year by Defendant's sole employee, Chuck Mausser,[5] Bench Trial Tr. 37:20–23, Kalnes looked to the gross receipts reported on each year's Schedule C form, then divided that amount by the journeyman wage rate specified in the Inside Agreements, *id*. at 36:25–37:4. He then divided that sum of hours by twelve to estimate the hours worked each month. *Id*. at 39:24–40:6. The hours calculated were offset by the hours reported by QCA Electric to account for contributions already made to the Plan. *See id*. at 41:15–24.

Based on these approximations of the hours Chuck worked each month, as well as an estimation of gross earnings based on the same numbers, Kalnes calculated the amount of

---

[3] Plaintiff intended to have Kalnes testify as an expert witness, Ex. List Joint Pretrial Order 2, ECF No. 72-1, but the Court granted Defendant's motion in limine, Mot. Limine 1, ECF No. 75, to bar his expert testimony because of Plaintiff's failure to provide proper disclosures under Federal Rule of Civil Procedure 26(a)(2), Nov. 22, 2022 Order 3–5, ECF No. 79.

[4] Kalnes testified that he also received a document that "looked like just a Word document with a list of addresses and some hours above it" but that this document was of no help in conducting an audit because it was not only incomplete but also lacking in key details necessary to verify the information. Bench Trial Tr. 57:17–58:2.

[5] Charles "Chuck" Mausser is Defendant's spouse. Bench Trial Tr. 88:23–24. Because he shares a last name with Defendant, the Court will refer to him as "Chuck."

contributions Defendant failed to pay to Plaintiff. *See id*. at 38:14–22, 42:21–23, 43:6–11. These calculations are contained in the audit report introduced by Plaintiff at trial (the "Calibre Report"). *See* Calibre Report, Pl.'s Trial Ex. 6. According to the Calibre Report, Defendant owes $162,650.56 in unpaid contributions. *Id*. at 3.[6]

**CONCLUSIONS OF LAW**

This is an action pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1). Venue is conferred pursuant to 29 U.S.C. §§ 185(a) and 1132(e)(2) because Plaintiff is located in this district and the breaches giving rise to this action occurred in this district. Plaintiff is a party in interest as to the Plan, as defined by ERISA. *See id*. § 1002(14)(A). Defendant is an employer, as defined by ERISA. *See id*. § 1002(5).

Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under . . . the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of . . . such agreement." 29 U.S.C. § 1145. A fiduciary may bring a civil action to enforce Section 515, *id*. § 1132(a)(3), and, in such an action, may recover the unpaid contributions and interest thereon; "an amount equal to the greater of interest on the unpaid contributions, or liquidated damages provided for under the plan in an amount not in excess of 20 percent . . . of the [unpaid contributions]"; and reasonable attorney's fees and costs, *id*.

[6] At trial, Defendant attempted to portray the Calibre Report as a "falsified" document because the cover letter to the report referenced using payroll in calculations and she did not use payroll, *see* Bench Trial Tr. 127:16–19, 128:18–23, and she asked the Court to exclude it on that basis, *id*. at 72:22–73:1. The Court denied that motion, *id*. at 73:15–17, and it does not now find that the Calibre Report's credibility is undermined because of the references in the report to payroll. *See, e.g.*, Calibre Report i ("The employer records we reviewed included payroll journals, individual earnings records, payroll tax returns, contribution reports, job classifications, and general disbursement records as appropriate."). It is clear from Kalnes's testimony that the cover letter is merely a form letter not tailored to each individual audit and therefore does not reflect the specific situation at hand in this case. *See, e.g.*, Bench Trial Tr. 47:21–23, 61:23–62:17.

§ 1132(g)(2). In its complaint, Plaintiff seeks an award of any delinquent pension fund contributions, interest on the unpaid contributions, liquidated damages, and audit and attorney's fees. Compl. 5, ECF No. 1.

The Court previously determined that, as Defendant signed the Letter of Assent, she agreed to be bound by the Inside Agreement and, in turn, the Trust Agreement, which require her to make monthly contributions based on the number of hours QCA Electric employees spend engaging in covered activities and on the gross payroll. Dec. 9, 2020 Order 4–5. The Court also found that under the Trust Agreement, Plaintiff has the power to collect these contributions and may, through the filing of lawsuits, seek to effectuate the collection. *Id.* at 5. Left unresolved was whether Defendant had failed to pay any required contributions and, if so, in what amount, as well as whether Plaintiff was entitled to other damages, costs, and attorney's fees. *Id.* at 9.

At the bench trial held to determine whether and in what amount the Court should award such damages, Plaintiff sought the following relief: 1) unpaid contributions in the amount of $162,650.56; 2) liquidated damages in the amount of $37,530.11; 3) costs in the amount of $1,265.00; and 4) attorney's fees in the amount of $11,088.75. *See* Joint Pretrial Order 2, ECF No. 72; *see also* Bench Trial Tr. 31:10–14 (indicating that Plaintiff seeks attorney's fees in the amount listed on the Joint Pretrial Order as well as attorney's fees incurred through trial).[7] The Court will first address Plaintiff's request for unpaid contributions.

[7] In the complaint, Plaintiff also requests interest on the unpaid contributions. Compl. 5. It did not mention interest in the Joint Pretrial Order, at trial, or in its Proposed Findings of Fact and Conclusion of Law. Further, in the latter document, Plaintiff indicates it wishes for the Court to "find[] that . . . Plaintiff's pending Motion to Compel Discovery is Granted." Pl.'s Proposed Findings of Fact & Concl. of Law 2, ECF No. 74. It is not clear to which motion Plaintiff is referring. At the time of entry of this Order, the Court does not see a pending motion to compel discovery.

## I. Unpaid Contributions

As the Court previously found that Defendant was liable for paying contributions, it need not revisit those findings. *See* Dec. 9, 2020 Order 9. Rather, it need only determine whether Defendant failed to pay any required contributions and in what amount.

### a. Records

The principal complication to this case is Defendant's failure to keep records sufficient to permit Plaintiff to ensure that she made all required contributions. ERISA provides that "every employer shall . . . maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1).[8] The Seventh Circuit "ha[s] characterized sufficient records as 'reliable, contemporaneous records' that demonstrate 'accuracy' in recording the work performed." *Trs. of Chi. Painters & Decorators Pension Tr. Fund v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 786 (7th Cir. 2007) (quoting *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 264 (7th Cir. 2003); *Laborers' Pension Fund v. RES Env't Servs., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004)); *see, e.g.*, *Trs. of the Chi. Plastering Inst. Pension Tr. v. Cork Plastering, Inc.*, No. 03 C 6867, 2007 WL 6080197, at *23 (N.D. Ill. Aug. 27, 2007) (finding that, where contributions were based on the location of the work performed, "accurate records" necessarily must have included location information); *Sullivan v. Tag Plumbing Co.*, No. 08 C 3669, 2012 WL 3835526, at *5 (N.D. Ill. Sept. 4, 2012) (finding records inadequate under ERISA where

[8] The amendment to the Trust Agreement likewise provides that a signatory employer must "maintain adequate, reliable, and contemporaneous records sufficient to determine the benefits due or which may become due to its employees." Amendment to Trust Agreement § IV.11. Because Defendant has a clear statutory obligation to maintain adequate records, the Court need not address in depth her contractual obligation to do the same. *Cf. Trs. of the Chi. Plastering Inst. Pension Tr. v. Cork Plastering, Inc.*, No. 03 C 6867, 2007 WL 6080197, at *23 (N.D. Ill. Aug. 27, 2007) ("The failure of the [relevant CBAs] to impose a specific obligation to maintain records of the location of work performed does not absolve [the employer] of its statutory obligation to keep records of that type, where—as here—those records are necessary to determine the correctness of the contributions made.").

they "reflect[ed] each employee's gross compensation, but not the number of hours that each employee worked"); *Cent. Ill. Carpenters Health & Welfare Tr. Fund v. Struben*, No. 05-1094, 2009 WL 497393, at *11 (C.D. Ill. Feb. 24, 2009) (finding records inadequate where "[t]he only records of hours worked [we]re the payroll summaries prepared by [the employer]," which "d[id] not show what type of work was being performed for what particular job" and many of which "were incomplete or had handwritten alterations shown on them"). This "record keeping obligation is necessary both to insure [sic] that the employer can correctly determine the contributions it must make, and that ERISA funds are able to audit an employer to verify the correctness of the contributions made." *Cork Plastering*, 2007 WL 6080197, at *23.

Defendant argued at trial that she kept adequate records. *See, e.g.*, Bench Trial Tr. 126:3–8. The Court presumes she is referring to the documents she introduced as Exhibit 1, which appear to be printouts of her submissions to an online reporting website, EPRLive. *See* EPRLive Reports, Def.'s Trial Ex. 1. These printouts contain only summaries of the hours worked per month and contributions accordingly made, *see id.*; there is no information regarding, for example, the specific dates these hours were worked, the types of jobs performed, or the breakdown of covered work versus non-covered work for each job. Nor does the information in the printouts appear to have been recorded contemporaneously to the work performed. A document with some information about job locations and hours was presented to Calibre Group, but when questioned about it, Kalnes stated:

> It was an incomplete record. There was no way to verify anything . . . . [I]t was just a summary of the hours. It didn't indicate which month it was worked, and since contributions are based on months of service, there was no way to verify what it was. . . . [I]t looked like just a Word document with a list of addresses and some hours above it. That didn't—couldn't tie to anything, couldn't reconcile to anything.

Bench Trial Tr. 57:17-58:2. In other words, Defendant's records, from the information presented to the Court, are wholly inadequate for purposes of ERISA.[9]

Defendant protests that, as a sole proprietorship whose sole employee is her spouse, she is not required to maintain payroll, timecards, or the like. *See, e.g.*, Bench Trial Tr. 126:4–7; *see also id*. at 45:3–11 (questioning Kalnes about lack of payroll and W-2s for employee spouses); *id*. at 90:15–19 (questioning Chuck about whether he receives a payroll check or a W-2). That may be, but it does not absolve her of her obligation under ERISA to maintain sufficient records from which an auditor could determine whether she has made all required contributions.[10] Were an employer's submissions to EPRLive or a similar reporting website sufficient under ERISA, audits by plan trustees would be completely ineffectual—this would essentially require trustees to take the employer's word that all covered hours were reported. Defendant's unspecific summaries of hours worked do not demonstrate the accuracy required under ERISA, as they do not allow for independent verification of their correctness.

**b. Calculations**

Without adequate records, it is impossible to determine with certainty whether Defendant owes unpaid contributions. Because this is not an unusual situation in ERISA cases, courts have developed practices that nonetheless allow plans to recover from such employers. In *Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, the Seventh Circuit adopted the burden-shifting framework articulated in two Ninth and Eleventh Circuit cases, under which, "if a trust fund has proved that the employer is liable for delinquent

[9] Defendant claimed she provided all of the documentation she had to Plaintiff, Bench Trial Tr. 126:24–127:2, but admitted she never provided it with the invoices for QCA Electric's jobs, *id*. at 127:3–7. Regardless, she stated in court that the invoices do not always contain details about the number of hours worked on each job. *Id*. at 127:8–11.

[10] Nor does the Court credit Defendant's arguments that Plaintiff's efforts to obtain documents and conduct an audit were some sort of campaign of harassment. *See, e.g.*, Bench Trial Tr. 102:20–103:22; 129:17–19. Plaintiff was entitled to conduct an audit and to request documentation accordingly. *See* Inside Agreement I § 2.26(C); Trust Agreement § VI.5.

contributions and that the employer has failed to keep adequate records, the burden shifts to the employer to come forward with evidence that the fund's calculation of damages are not accurate." 71 F.3d 1361, 1367 (7th Cir. 1995) (citing *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1338–39 (9th Cir. 1988); *Combs v. King*, 764 F.2d 818, 826–27 (11th Cir. 1985)). It has since made clear, however, that this approach applies only at summary judgment; "[o]nce a case comes to trial, . . . the burden-shifting structure . . . falls away." *Reinke*, 347 F.3d at 265.[11] "As always, at trial the plaintiff bears the burden of proof." *Struben*, 2009 WL 497393, at *10.

Even at trial, though, "an employer cannot escape liability 'by hiding behind his failure to keep records as statutorily required.'" *Id.* at *11 (quoting *Brick Masons*, 839 F.2d at 1338). Rather, a fact-finding court may accept a reasonable estimation of the damages owed to a fund where "the absence of records that would allow [the court] to perform a precise calculation stems from [the employer's] failure to follow its statutory obligation." *See Cork Plastering*, 2007 WL 6080197, at *23; *see also Trs. of the Chi. Plastering Inst. Pension Tr. v. Solarcrete Energy Efficient Bldg. Sys. Inc.*, No. 04 C 7820, 2009 WL 3055383, at *9 (N.D. Ill. Sept. 17, 2009) ("[T]o the extent an employer fails to [maintain accurate records], an auditor may make reasonable assumptions to approximate hours worked."). "To ignore this real[i]ty would be to effectively reward[] [the employer] for keeping slipshod . . . records." *Cork Plastering*, 2007 WL 6080197, at *23 (second and fourth alteration in original) (quotation marks omitted). Thus, "an award of damages under these circumstances [is not] precluded by the rule that bars recovery of uncertain and speculative damages." *Struben*, 2009 WL 497393, at *22 (noting that "it would be a perversion of fundamental principles of justice" to deny all relief to a damaged plaintiff in

[11] It is therefore not appropriate for the Court to use this burden-shifting framework now, although Plaintiff suggested it would be in its closing argument. *See* Bench Trial Tr. 122:22–123:8.

this situation). "It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages." *Id*. (quotation marks omitted).

Any assumptions made by the court must nonetheless be "just and reasonable." *See id*. (quotation marks omitted). Reasonableness depends on the facts of the case. In *Brick Masons*, for example, the Ninth Circuit determined that an employer who failed to keep proper records was liable to pay contributions for every hour worked by employees who had performed any covered work at all during the audit period, deeming this a reasonable presumption in light of the circumstances. 839 F.2d at 1339; *see Struben*, 2009 WL 497393, at *14 (applying this presumption because "[t]here [wa]s absolutely no documentation that would establish which of those hours were [covered] and which were [not covered]"). In a Northern District of Illinois case in which records showed whether a given employee worked during a particular period but not how many hours or whether they were covered, the court agreed with the plaintiffs' accountant's assumption that "any employee who worked any day during a period in question worked 40 hours during each week of that period." *Divane v. Am. Lighting Sys., Inc.*, No. 00 C 4556, 2002 WL 655307, at *2 (N.D. Ill. Apr. 19, 2002). While noting that "there [wa]s no perfect solution," the court concluded that "[the accountant's] assumption [wa]s preferable to simply accepting the defendant's testimony that" the amounts paid were accurate. *Id*. Another court disregarded the employer's payroll records, finding them incomplete and unreliable, and instead adopted the plaintiff's "novel theory" of calculating the number of hours worked based on the amount of raw material the employer used throughout the period, as this would "permit a more accurate determination." *Trs. of the Chi. Painters & Decorators Pension Tr. Funds v. Darwan*, No. 01 C 2458, 2004 WL 2646667, at *1 (N.D. Ill. Nov. 19, 2004). And in a case where the total amount of hours was recorded but not whether each hour was worked in a

covered location, it was found appropriate to reject the plaintiff's assumption that all hours were worked in a covered location and to instead assume the same ratio of covered to not covered work shown by the employer's invoices. *Cork Plastering*, 2007 WL 6080197, at *13, *23–24 ("[The court] conclude[s] that th[is] approach . . . is a reasonable one.").

Here, Calibre Group used Defendant's Schedule C forms to generate an approximation of the hours worked by Chuck. *See* Bench Trial Tr. 36:10–20. The Court does not take issue with making such calculations using an estimation; as discussed above, this is eminently reasonable when faced with an employer's failure to keep proper records. *See Struben*, 2009 WL 497393, at *21 ("[The employer] cannot be heard to complain that damages lack the exactness and precision of measurement that would be possible had records been kept in accordance with the requirements of ERISA."). The Court also finds that the Schedule C forms are the only source of evidence from which an auditor could attempt to verify Defendant's contributions. As discussed above, Defendant's submissions to EPRLive are not adequate independent evidence of hours worked. There was no testimony from Chuck as to the amount of work he performs or his hours in any given month. Chuck testified that he prepares invoices for every job that he works, but these invoices were never produced for an audit or in discovery. Bench Trial Tr. 107:6–21; *see also id*. at 63:22–24 (testimony from Kalnes that Defendant never provided Calibre Group with invoices). Thus, the Court does not disagree with the choice to make calculations using the Schedule C forms. *See Trs. of the Chi. Plastering Inst. Pension Fund v. R.G. Constr. Servs., Inc.*, No. 05 C 5669, 2009 WL 1733036, at *8 (N.D. Ill. June 16, 2009) ("[T]hough it is true that once at trial, there is no longer a burden-stuffing [sic] approach applied . . . [,] an auditor's calculations, nonetheless, are presumed correct in such situations.").

Nonetheless, the Court must scrutinize the approximation to ensure that it is just and reasonable. Kalnes testified that he took the gross receipts from Defendant's Schedule C forms and divided them by the journeyman wage rate to estimate the number of hours worked per year. Bench Trial Tr. 36:25–37:4.[12] On cross-examination, he defined gross receipts as "the total income received by—through the company" and admitted that they could include not just labor costs but also material sold to clients. *See id*. at 49:4–10. Chuck testified that some of his work involved selling materials to clients, not just labor. *Id*. at 101:6–10. Further, the Schedule C forms include entries listing material purchased by QCA Electric. *Id*. at 51:14–20; *see, e.g.*, Schedule C Forms 2 (quantifying expenses for electric, plumbing, and other material in 2015).[13] When Defendant asked Kalnes whether it would "seem more realistic" to subtract the cost of materials from the gross receipts before dividing by the wage rate, he replied: "I would say so." Bench Trial Tr. 58:15–24.

Given Kalnes's testimony about how the audit was conducted, Defendant's cross-examination of Kalnes, and Chuck's testimony, the Court finds that to award Plaintiff unpaid contributions calculated from the gross receipts without subtracting the cost of materials would result in an unjust windfall for Plaintiff. *See Cork Plastering*, 2007 WL 6080197, at *22 (rejecting a suggestion by the plaintiffs that "would create a windfall for the [funds], by awarding contributions for work" not covered by the agreements and where a method was available to estimate the ratio of covered to not covered work). While it may not be possible to tell from the Schedule C forms alone whether the costs of the material were, in every case, passed on to the

---

[12] The Court has not found a single other case in which unpaid contributions were calculated this way. *Cf. Solarcrete*, 2009 WL 3055383, at *5 (noting that the auditor initially "had to make various estimates based on . . . [the employer's] tax returns and payroll registers" but that the audit was updated when it was discovered during the bench trial that the employer had access to numerous employee timecards).

[13] Because the Schedule C forms are not consecutively paginated, the Court uses the page number of the combined PDF in the exhibit.

consumer and therefore appeared as payment in the gross receipts, the assumption that the gross receipts also include the reported materials costs strikes the Court as a "reasonable, common sense approach." *See id*. at *24. The Court does not, however, believe it would be appropriate to subtract out other business expenses, such as fuel and cell phone expenses, *see* Bench Trial Tr. 55:5–9; *see, e.g.*, Schedule C Forms 4, as no testimony supports the inference that these expenses were directly passed on to clients. For these reasons, the Court does not accept the Calibre Report's calculation of the number of hours worked. Instead, the number of hours should be calculated using the gross receipts minus the cost of materials, not the gross receipts as a whole. *Cf. R.G. Constr.*, 2009 WL 1733036, at *6 (rejecting the employer's "attempt[s] to punch holes in the audit" where the employer "failed to . . . show how a more credible result would have been obtained by using a different methodology").

With these revised numbers, another question arises: how many of the hours worked went towards covered activities? Scott Verschoore, a retired business manager for the Union, testified that the Inside Agreement does not cover plumbing work and may not cover heating, ventilation, and air conditioning ("HVAC") work. *See* Bench Trial Tr. 76:11–14, 78:18–81:9. Bergfeld similarly testified that plumbing work was not covered and added that the Inside Agreement said nothing about carpentry or HVAC work. *Id*. at 110:8–16. Chuck testified that he does some non-electrical work, such as running a service van, *id*. at 99:7–10, 101:2–3, but he never stated *when* he performed these non-electrical tasks. Nor did he provide any approximation of how much of his work was non-covered. Thus, the Court runs into the same issue as above—there is simply no way to accurately determine what percentage of the estimated hours total are

covered.[14] *Cf. Cork Plastering*, 2007 WL 6080197, at *13 (applying a ratio of covered to non-covered work generated by looking to invoices). But because Chuck admitted he performed covered electrical work during the period in question, *see id*. at 105:6–11, and in the absence of any evidence from which the Court could estimate the ratio of covered to non-covered work, the Court finds it appropriate to adopt the assumption articulated in *Brick Masons* and applied in other Seventh Circuit district cases: that all hours worked went towards covered activities. *See Brick Masons*, 839 F.2d at 1339; *Struben*, 2009 WL 497393, at *14.[15]

Because the Court has settled on an alternative method of calculating the approximate hours worked by QCA Electric's employee to the one used in the audit, revised numbers are needed. Kalnes testified as to the method he used in his calculations, Bench Trial Tr. 36:8–43:19; the Calibre Report is also fairly extensive. Still, the Court finds that it does not have enough information to perform the re-calculations itself. *See, e.g.*, *id*. at 121:20–24 (noting that there are step increases to the wage rate, which "changes the calculations from month to month or at least the first half of the year to the second half"). Facing similar circumstances, courts have stayed entry of judgment after a bench trial and directed the parties to submit updated calculations accounting for the court's findings. *See, e.g.*, *Trs. of the Chi. Painters & Decorators Pension Tr. Funds v. Darwan*, No. 01 C 2458, 2004 WL 1459553, at *1, *21 (N.D. Ill. June 29, 2004) (finding in favor of the plaintiff after a bench trial but staying entry of judgment to brief

---

[14] This is also true for determining the percentage of materials costs in the Schedule C forms that were used for non-covered activities. *See* Bench Trial Tr. 69:18–70:4 (Plaintiff's counsel: "And so there's no way of knowing what material is HVAC versus plumbing versus electrical, is there?" Kalnes: "No, there's not.").

[15] This approach is bolstered by the provision in the amendment to the Trust Agreement stating that "[i]n the event that an [e]mployer fails to maintain adequate, reliable, and contemporaneous records establishing the amount of hours worked by employees who are paid on an hourly basis," it "hereby agrees that all hours worked [for] which the employee received pay or was entitled to receive pay from the employer . . . shall be considered hours worked for which contributions are due to the Fund." Amendment to Trust Agreement § IV.11. Although the amendment was adopted in October 2017 and therefore does not apply to the entire period at issue, it nonetheless supports that the assumption the Court makes above is reasonable.

the proper calculation of damages); *R.G. Constr.*, 2009 WL 1733036, at *19 (directing the funds to file a supplemental submission calculating the exact dollar amount of judgment according to certain parameters established by the court after a bench trial). This Court will do the same.

The Court therefore finds that Plaintiff is entitled to recover Defendant's unpaid contributions but stays judgment to allow for the re-calculation of the appropriate amount. Plaintiff is directed to provide an updated audit report to the Court and to Defendant. In the updated report, prior to dividing the gross receipts for each year by the appropriate journeyman wage rate, Plaintiff must subtract from the gross receipts the cost of materials reported for that year in Defendant's Schedule C Forms. *See* Schedule C Forms 2–12 (listing Defendant's materials expenses for 2015, 2016, 2017, 2018, 2019, and 2020).

**II. Interest, Liquidated Damages, Costs, and Fees**

Because the Court has found that Plaintiff is entitled to an award of unpaid contributions, it must also award Plaintiff interest on the unpaid contributions, liquidated damages, and reasonable attorney's fees and costs. *See* 29 U.S.C. § 1132(g)(2). However, several of these are contingent upon the exact amount of the unpaid contributions, *see, e.g.*, Bench Trial Tr. 28:14–18 (asking for liquidated damages in the amount of twenty percent of the unpaid contributions), and so Plaintiff's previously requested amounts are no longer appropriate. Thus, the Court also directs Plaintiff to submit updated briefing on the amount of interest and liquidated damages it seeks after re-calculating the unpaid contributions. *See R.G. Constr.*, 2009 WL 1733036, at *18 (directing the funds to provide updated figures for interest and liquidated damages after re-calculating the amount of unpaid contributions). As the Court found that it would be appropriate to bifurcate its determination of attorney's fees until after its resolution of the damages, Bench Trial Tr. 74:24–75:6, Plaintiff is further directed to provide briefing on its request for attorney's

fees and the amount of attorney's fees it seeks through trial. The Court will determine the appropriate amount of interest, liquidated damages, costs, and attorney's fees after it receives the updated audit report.

**CONCLUSION**

The Court finds that Defendant Linda K. Mausser, individually and d/b/a QCA Electric, is liable to Plaintiff Trustees of the N.E.C.A./Local 145 I.B.E.W. Pension Plan, as Collection Agent for All Fringe Benefits for unpaid contributions, interest on the unpaid contributions, liquidated damages, costs, and attorney's fees. Entry of judgment is stayed to permit Plaintiff to submit an updated audit report, re-calculating the amount of unpaid contributions according to the method specified in this Order. Plaintiff is directed to submit to the Court and Defendant the updated audit report or a status report by February 27, 2023. At the same time it submits the updated audit report, it must submit supplemental briefing on the amount of interest, liquidated damages, and attorney's fees as described above. Defendant may submit a response to the updated audit report and the supplemental briefing within two weeks of their service.

Entered this 6th day of February, 2023.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE